

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| STEPHANIE FERNANDEZ, | § | No. 08-18-00079-CR |
| Appellant, | § | |
| | | Appeal from the |
| v. | § | |
| | | 210th District Court |
| | § | |
| THE STATE OF TEXAS, | | Of El Paso County, Texas |
| | § | |
| Appellee. | | (TC#20170D03993) |
| | § | |

**O P I N I O N**

Appellant, Stephanie Fernandez, appeals her conviction for capital murder and sentence to life imprisonment.[1] TEX.PENAL CODE ANN. § 19.03(a)(2). Appellant raises three issues on appeal: (1) the trial court erred in striking her testimony during the hearing on the motion to suppress and overruling her suppression motion; (2) the evidence was insufficient to support a conviction based on the law of parties and conspiracy to commit burglary or robbery; and (3) the evidence was insufficient to show Appellant should have known a killing would occur during the course of a robbery. Finding no error, we affirm.

---

[1] We note that the trial court has certified Appellant's right to appeal in this case, but the certification does not bear Appellant's signature. Out of abundance of caution, the Court ORDERS Appellant's attorney, pursuant to TEX.R.APP.P. 48.4, to send Appellant a copy of this opinion and this Court's judgment, to notify Appellant of her right to file a *pro se* petition for discretionary review, and to inform Appellant of the applicable deadlines. *See* TEX.R.APP.P. 48.4, 68. The Court further ORDERS Appellant's attorney to comply with all the requirements of Rule 48.4.

# BACKGROUND

## *Factual Background*

### *The Offense*

Tyler Croke ("Croke") and Dale Walby ("Walby") met in October 2016 while both were stationed at Fort Bliss. After being kicked out of the Army for possessing drugs, Croke moved in with Walby at an apartment in El Paso ("the apartment"). According to Walby, Croke sold drugs while attending school.

On May 7, 2017, at around 1:20 a.m., four codefendants, Olsen, Johnston, Acosta and Chilton, broke into the apartment to steal drugs. Croke was alone at the apartment taking a shower. Olsen and Johnston each carried a knife, Acosta carried a shotgun, and Chilton carried a BB gun that resembled a shotgun. Olsen grabbed Croke out of the shower and Croke was thereafter restrained by the others. The codefendants told Croke they wanted his drugs. Croke was released to retrieve the drugs, and after securing the drugs, Olsen and Johnston held Croke down again, while Acosta put a shotgun on his buttocks. Appellant stated Johnston stabbed Croke in the neck with the knife. Appellant told police Croke did not die immediately, but began to drag himself across the floor, at which point Olsen cut his neck with a knife. The codefendants then ran out of the apartment to the getaway car driven by Appellant.

### *Prior History*

Walby dated Appellant for one or two months in April 2016. According to Walby, sometime in February 2017, Croke, who was selling ecstasy pills and cocaine, complained about a woman who was selling overpriced drugs. As Croke and Walby spoke, they both realized the woman Croke was complaining of was Appellant. Walby testified he had not spoken to Appellant

2

since they had stopped dating, but he contacted her to help smooth things over between Croke and Appellant.

According to Walby, he was in touch with Appellant the week leading up to Croke's death, and communicated with her via text, snapchat, and telephone. Walby testified Appellant had been to his apartment two or three times before. Via text messages in April 2017, Appellant discussed moving in with Walby, who was hesitant because of the problems between Appellant and Croke. Appellant told Walby she was fine with Croke because it was bad for business, which Walby understood to mean her drug-dealing business.

The night of Croke's death, Croke was "partying" with Walby, but became anxious and went back to the apartment. Walby drove Croke back to the apartment, and Walby returned to the party. That same evening, Appellant texted Walby asking what he was doing, and he told Appellant he was headed out with his "crew." Appellant asked who his "crew" consisted of, but Walby did not respond with specific names. Appellant then asked if his roommates were going out with him because she would like to go with them, to which Walby responded, "Ya. And ok." Appellant asked again where they were going, but Walby failed to respond. At 12:13 am, 3:29 am, and 3:45 am that same night, Appellant and Walby exchanged texts about how they missed one another.

Walby was notified about Croke's death the following morning, turned over Croke's tablet to police and gave consent to a search of his phone. Walby testified he did not give Olsen, Johnston, Acosta, or Chilton consent to enter his apartment. Under cross-examination, Walby speculated Appellant may have understood Croke was out with Walby that night. Walby stated after Croke's death, Appellant told him Croke was killed because he owed a tax on his pills.

3

Croke's tablet contained text exchanges between Appellant and Croke beginning April 6, 2017. Croke reminded her they had met before at the barracks with Olsen and Johnston. Croke told Appellant he wanted to put any hard feelings behind them, and asked her if she wanted to do business with him. On April 14, 2017, Appellant responded she was interested in "five bins" for "this dude." On April 14 and 15, 2017, several texts between Appellant and Croke discussed prices. On April 18, Croke informed Appellant via text he had been laying low because he was "catching heat." He told her it was his understanding from Walby that she thought he was a snitch. Additionally, he told her he was not sure if Olsen and his crew were "talking shit," but he wanted to shut down any "rumors or shit talk" that was occurring. Appellant did not respond, but texts were later exchanged between her and Croke from April 28 to May 3 discussing possible drug sales.

*Appellant's Statement*

Based on Walby's information and video-surveillance from the apartment complex, El Paso police began to search for Appellant. Appellant and Chilton were subsequently stopped and Appellant was arrested on traffic warrants. Eventually, Appellant provided a statement.

In the video-recorded statement, Appellant was given her Miranda warnings and indicated she understood them. Appellant began her statement explaining why Croke was killed. Appellant needed money and Olsen, Johnston, and Acosta gave her a loan so she would not have to work as a prostitute. However, she was unable to pay the loan, and according to Appellant, Olsen, Johnston, and Acosta told her Croke was a drug dealer and ordered her to find out where he hid his drugs so they could rob him. Appellant told them she wanted to ensure no one would be home during the robbery. Appellant suggested she could arrange Croke and his roommate go with her to a rave

4

party for the night, but according to Appellant, Olsen ordered she go with them to the robbery because she knew too much. Appellant stated they initially planned to commit the robbery on Friday, May 5, 2017, but were unable to. They planned to meet the following day in Las Cruces at the home of a woman named Jess to finalize their plan, and Johnston told her she needed to be there "or else."

Chilton and Appellant were dating at the time and he insisted on going with her. At first, Acosta complained Chilton was going to be a problem, but ultimately allowed Chilton to join. Appellant stated Olsen, Johnston, Acosta, and Chilton were all present at the meeting in Las Cruces, and they had knives, a shotgun, masks, gloves, and trac phones so they could text one another. Before they left to El Paso, Appellant texted Walby to ask him where he would be, and Walby responded he was going out with his crew. Appellant explained she attempted to confirm with Walby that he was going out with his roommate—Croke—and, according to her, Walby said he was.

Appellant stated they headed out for El Paso from Las Cruces at around 11:30 p.m. In route to the apartment, they gave each other code names, and planned and discussed the specific roles each of them would play. According to Appellant, Acosta, armed with a shotgun, would clear the left side, Olsen, armed with a knife, would clear the dining room and the front room, Johnston, also armed with a knife, would go into the hallway, and Chilton, armed with a BB gun, would cover their backs. Appellant stated during this discussion, the codefendants were "going crazy" and yelling as though they were going on a mission. Acosta suggested they should burn Croke up with a container of gas from Appellant's vehicle. According to Appellant, Olsen, Acosta and Johnston kept talking about hurting someone, and she told them to stop saying that because nobody

5

was going to be home and they could hurt someone else given it was an apartment complex. However, Appellant suspected her codefendants might have known Croke would be at the apartment based on their behavior. Appellant described the layout of the apartment to her codefendants and where Croke's room and drugs were located.

Upon arrival at the apartment-complex, Appellant parked the car and checked if anyone was in the apartment. Appellant believed the apartment was empty because she did not see any lights on or spot Walby's car. When she returned to the car, the codefendants put on their masks, gathered their weapons, and Olsen told her to keep the car running. Appellant told Chilton she loved him and if he saw anyone come out of Walby's room, he should leave because Walby was trained in black belt and weapons. Acosta overheard and told Appellant he was going straight to Walby's room to get him, which caused her to "freak out" because although Walby told her he was not home, she feared Walby may be asleep or so high that he did not know he was still home.

Before they ran into the apartment, Olsen instructed Appellant to text them in 10 minutes and if they were not out by then, to go looking for them. At the 10-minute mark, just as Appellant texted, Johnston came out telling her not to worry because Croke was dead. Then about a minute later, the others ran to the car telling Appellant to take off. Appellant said she was "freaking out," and accelerated so fast out of the apartment parking lot that her car screeched. On the way to Appellant's apartment, the codefendants told Appellant Croke begged for his life and fought back, but because Croke was wet, Olsen could not get a firm grip on him. As the codefendants restrained him, Croke asked why they were there, and they told him they wanted the drugs. Croke brought them a bag of drugs. Croke struggled with the codefendants again and Johnston cut his neck. All the while, Acosta held the shotgun to his buttocks and threatened to shoot him. However, Croke

6

was not dead and dragged himself along the floor, at which point Olsen cut "his head off with the knife." According to Appellant, Croke had stolen Olsen's new car, crashed it, and then abandoned it. When they got to Appellant's apartment, Appellant laid a white sheet on the floor and everyone put their bloody clothes and shoes on the sheet. Appellant gave them all fresh clothes to wear. Olsen instructed Appellant to soak the knives in bleach, and they cleaned the shotgun because Acosta touched Croke with it. Appellant was shown the three bags of cocaine and three bags of ecstasy pills retrieved from Croke, to which she responded, "[t]his is what you killed a man for." The codefendants ordered Appellant to sell the drugs, but she refused. The bloody clothes and shoes were wrapped in the white sheet and put in Appellant's vehicle. Olsen and Johnston told Appellant to take them back to Las Cruces, which she did. Appellant stated by the time they reached Las Cruces, everybody was under the influence of drugs except for her and Chilton. Olsen told Appellant to return to Las Cruces the next day. Appellant returned to Las Cruces the following day and they burned the bloody clothes and shoes in a bonfire.

Appellant stated she noticed a cut on Johnston's left hand and right ear. Olsen told her he had a cut, but she never saw it. Photos of Johnston and Olsen after their arrest display injuries to their hands and arms. Appellant identified Olsen, Johnston and Acosta as codefendants, and expressed fear they would discover her identification of them.

Under cross-examination, Detective Parsons denied he attempted to build rapport with Appellant prior to her video-recorded statement in an attempt to persuade her to confess. Detective Morales testified the first time he advised Appellant of her *Miranda* rights, he failed to have her sign an acknowledgement-of-*Miranda*-rights card. *Miranda v. Arizona*, 384 U.S.436 (1966).

7

Detective Morales also acknowledged he lied to Appellant when he said her statement was not being recorded, but explained he only told her so to make her more comfortable.

Chief Medical Examiner Mario Rascon testified Croke died of multiple sharp-force injuries. Dr. Rascon confirmed Croke sustained injuries to his neck, lips, leg, forearm, chest and a large, gaping, incised wound primarily on the right side of his neck.

### *Procedural Background*

The jury found Appellant guilty of capital murder and the trial court sentenced her to life imprisonment. TEX.PENAL CODE ANN. § 19.03(a)(2). This appeal followed.

## <u>DISCUSSION</u>

Appellant raises three issues on appeal. First, she asserts the trial court erred in striking her motion to suppress testimony, thereby depriving her of a full defense under the Fourteenth Amendment and her Fifth Amendment right against self-incrimination. Second, Appellant argues the evidence is insufficient to support her conviction because Croke's death was not committed in furtherance of the robbery or burglary. Last, Appellant argues the evidence is also insufficient to support she should have known a killing would occur because she was under the mistaken belief no one was at the apartment. We affirm.

### Issue One: Motion to Suppress

### *Standard of Review & Applicable Law*

We review a ruling on a motion to suppress using a bifurcated standard of review. *Guzman v. State*, 955 S.W.2d 85, 87–91 (Tex.Crim.App. 1997). A trial court's findings of historical facts, and determinations of mixed questions of law and fact that turn on credibility and demeanor, are afforded almost total deference if reasonably supported by the record. *Id.* We review a trial court's determination of legal questions and its application of the law to facts that do not turn upon a

8

determination of witness credibility and demeanor *de novo*. *Id.* When a trial court denies a motion to suppress, we will uphold that ruling under any theory of the law applicable to the case. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex.Crim.App. 2005).

The Supreme Court has ruled a violation of *Miranda* occurs when officers elicit an unwarned confession from a defendant, and thereafter advise the defendant of his *Miranda* rights, then proceed to have the defendant repeat the first, unwarned confession, resulting in a second, *Mirandized* confession. *Missouri v. Seibert*, 542 U.S. 600, 604 (2004). This two-step interrogation process is often referred to as the "question first and warn later" interrogation strategy. *Id.* at 611. Texas courts "apply an objective, totality-of-the-circumstances inquiry to determine if the two-step interrogation process was used in a calculated effort to undermine *Miranda*." *Vasquez v. State*, 411 S.W.3d 918, 919 (Tex.Crim.App. 2013).

### *Suppression Hearing*

Detective Morales testified he verbally read the *Miranda* warnings to Appellant after her arrival to the police station at around 4:00 p.m. Appellant's videotaped statement begins at 8:53 p.m., and Appellant is read her *Miranda* warnings at the beginning of the video-taped statement.

Appellant, on direct examination, testified for twelve minutes at the motion to suppress hearing before invoking her Fifth Amendment right. Appellant stated she was in a holding cell and began to suffer of an anxiety attack before she was taken outside for a cigarette break. Sometime later, she alleges she was placed in an interview room and pressured to answer questions, then was taken outside for a second cigarette break. According to Appellant, "[the detectives] gave me the guilt trip of, think about the mother of this boy. Think about your boyfriend and how he feels about this. Think about everybody. Think about the life that was lost, that it's -- you could tell us. You could end all this. You could help us to put everybody that needs to be put away, away. And I

9

started crying." As Appellant finished her last cigarette, she claims she was asked by the detectives "who was there with you -- who was there with you that day? "And I answered them[,]" said Appellant. Appellant asserted she was not *Mirandized* until her statement was formally taken after the two cigarette breaks. Appellant testified the first and only time she was *Mirandized* was at the beginning of her video-taped statement.

The State's first question on cross-examination was met with Appellant's assertion, "I plead the Fifth." The trial judge responded "[w]ell, you've exercised your Fifth, so I'm going to strike your testimony." The trial court stopped any further cross-examination of Appellant and recessed until the following day. The following day, at the close of the motion to suppress hearing, on the record in open court, the trial court made the following partial findings of fact and conclusions of law:

> The Court finds that the statements were obtained in compliance with the United States Constitutional provisions of the Fifth Amendment, Sixth Amendment and in Texas, the equivalent Texas Constitutional provisions. Furthermore, that it's in compliance with 38.21, 38.22; that the confessions or statements that were made, were made freely and voluntarily made without compulsion or persuasion under the law and also under 38.23. There's no violation of either the state or federal constitutions.
> Furthermore, the Court will find that the evidence and the testimony of Detective Parsons and Morales was credible and that the Court has heard it and reviewed the statement, the electronically recorded statement, to the extent it was presented to the Court and the exchange between the defendant and the detectives.
> *Even taking into consideration, the testimony of the defendant, even though it was stricken*, that the Court saw no indication of any sort of illegal persuasion or subterfuge or any sort of conduct that the detective engaged in that would render any of the evidence that was obtained on State's Exhibit No. 2, the electronic recording, illegal. [Emphasis added].

No objection was lodged by either side to the trial court's essential "unstriking" of Appellant's testimony and subsequent consideration of it in his findings of fact. Appellant's motion to suppress was denied.

10

*Analysis*

It is well-settled law that a trial court retains plenary jurisdiction to reconsider its interlocutory rulings until a final judgment or order is entered in the cause and the decree becomes final. *See Rodriguez v. State,* 852 S.W.2d 516, 520 (Tex.Crim.App. 1993); *Fruehauf Corp. v. Carrillo,* 848 S.W.2d 83, 84 (Tex. 1993); *White v. Baptist St. Anthony's Hosp.,* 188 S.W.3d 373, 374–75 (Tex.App.—Amarillo 2006, pet. denied); *Orion Enters., Inc. v. Pope,* 927 S.W.2d 654, 658 (Tex.App.—San Antonio 1996, orig. proceeding). In *Martinez*, the San Antonio Court of Appeals upheld the trial court's right to reconsider its own rulings *sua sponte,* stating there is "no reason to conclude trial judges must be chained to erroneous rulings until a party urges reconsideration." *Martinez v. State,* 336 S.W.3d 338, 342 (Tex.App.—San Antonio 2010, no pet.). Accordingly, the San Antonio Court of Appeals held the trial court did not abuse its discretion by *sua sponte* reversing an evidentiary ruling during trial. *Id.* at 341-342. We also note Rule 33.1(a) allows for an implied ruling by the trial court. TEX.R.APP.P. 33.1(a)(2)(A); *Gutierrez v. State,* 36 S.W.3d 509, 510 (Tex.Crim.App. 2001).

Our own precedent states:

[W]e reject a flat rule that once an objection or motion is ruled upon the court may not reconsider the point and alter his ruling. We understand the backup comfort which defense counsel may experience in obtaining what would appear to be assured reversible error and the consternation attending a reversal of the offensive ruling, removing the defense's ultimate safety net. The constitution and rules of procedure, however, are primarily intended to insure the right to a fair trial and are not intended to create a vested right in reversible error. The various rules of procedure are replete with examples of situations in which a court may alter an initial ruling.

*Alvarez v. State,* 804 S.W.2d 617, 619 (Tex.App.—El Paso 1991), *aff'd.,* 864 S.W.2d 64 (Tex.Crim.App. 1993)(*citing* TEX.CODE CRIM.PROC.ANN. art 38.22, § 6; TEX.R.APP.P.

30(b); TEX.R.CRIM.EVID. 104(b); *Williams v. State*, 94 Tex.Crim. 60, 249 S.W. 852 (1923); *Lott. v. State*, 60 Tex.Crim. 162, 131 S.W. 553 (1910)).

Here, the trial court initially struck Appellant's direct testimony and did not allow the State to cross-examine her. However, in the trial court's rendition of its findings of fact, the trial judge stated he considered Appellant's testimony, which did not include any cross-examination testimony by the State, and read into the record "[e]ven taking into consideration, the testimony of the defendant, even though it was stricken[.]" The record supports a finding the trial court *sua sponte* reconsidered his striking of Appellant's testimony, reversed himself, and explicitly considered her direct testimony. Additionally, the State was never afforded an opportunity to cross-examine Appellant regarding her testimony on direct. We find the trial court, in considering and "unstriking" Appellant's direct testimony in ruling on the motion to suppress, did not violate Appellant's Fourteenth or Fifth Amendment rights. Thus, the trial court did not abuse its discretion in denying Appellant's motion to suppress.

Issue One is overruled.

## Issues Two and Three: Sufficiency of the Evidence

### *Standard of Review*

To assess the legal sufficiency of evidence supporting a criminal conviction, we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007); *Lashley v. State*, 401 S.W.3d 738, 743 (Tex. App.—Houston [14th Dist.] 2013, no pet.). We may not substitute our judgment for that of the jury by reevaluating the weight and credibility of the evidence. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex.Crim.App. 2012);

*see also Isassi v. State*, 330 S.W.3d 633, 638 (Tex.Crim.App. 2010). Rather, we "give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Hooper*, 214 S.W.3d at 13, (*quoting Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)).

The jury is permitted to draw multiple reasonable inferences from facts so long as each inference is supported by the evidence presented at trial. *Temple v. State*, 390 S.W.3d 341, 360 (Tex.Crim.App. 2013). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and therefore defer to that determination." *Id.*, (*citing Jackson*, 443 U.S. at 326.

We measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge. *Thomas v. State*, 303 S.W.3d 331, 333 (Tex.App.—El Paso 2009, no pet.)(*citing Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997)). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Malik*, 953 S.W.2d at 240. Each fact need not point directly and independently to the defendant's guilt so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Circumstantial evidence is equally as probative as direct evidence in establishing guilt; circumstantial evidence alone can suffice to support a conviction. *Id.*

### *Analysis*

The indictment, in relevant part, charged Appellant with capital murder as follows:

> [Appellant] did then and there intentionally cause the death of an individual, namely, TYLER CROKE, by cutting TYLER CROKE in the neck with a knife, and

13

the Defendant was then and there in the course of committing or attempting to commit the offense of burglary of a habitation,

[Appellant] did then and there intentionally cause the death of an individual, namely, TYLER CROKE, by cutting TYLER CROKE in the neck with a knife, and the Defendant was then and there in the course of committing or attempting to commit the offense of aggravated robbery,

And it is further presented that the said Defendant was a party to the offense and knew that a deadly weapon, to wit: a firearm or knife, would be used or exhibited during the commission of or immediate flight from said offense[.]

As applied to this indictment, a person commits capital murder if she intentionally or knowingly causes the death of an individual and intentionally commits that murder during the course of a robbery or attempted robbery. TEX. PENAL CODE ANN. §§ 19.02(a), 19.03(a)(2). A person commits robbery if, in the course of committing theft, and with intent to obtain or maintain control of the property, she intentionally, knowingly, or recklessly causes bodily injury to another or she intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. TEX.PENAL CODE ANN. § 29.02(a). A person commits theft if he unlawfully appropriates property with intent to deprive the owner of property. TEX.PENAL CODE ANN. § 31.03(a). "In the course of committing" refers to conduct occurring in an attempt to commit, during the commission of, or in the immediate flight after the attempt or commission of the murder. *McGee v. State*, 774 S.W.2d 229, 234 (Tex.Crim.App. 1989). A person commits aggravated robbery if she uses or exhibits a deadly weapon during the commission of a robbery. TEX.PENAL CODE ANN. § 29.03(a)(2). A firearm is a deadly weapon per se. TEX.PENAL CODE ANN. § 1.07(a)(17)(A).

To prove the offense of capital murder where robbery or attempted robbery is the alleged aggravating element, the State need not prove a completed robbery, but must only show that an intent to rob was formed prior to or during the commission of the murder. *Maldonado v. State*, 998

14

S.W.2d 239, 243 (Tex.Crim.App. 1999); *Robertson v. State*, 871 S.W.2d 701, 705 (Tex.Crim.App. 1993). Intent to steal may be inferred from the facts. *McGee*, 774 S.W.2d at 235.

In Issue Two, Appellant argues the evidence is insufficient to support the killing was committed in furtherance of the conspiracy to commit burglary or robbery. Specifically, Appellant alleges Croke's murder was not committed in furtherance of the felony because Croke did not resist the invasion and complied with the invader's commands by relinquishing the drugs. Appellant further asserts the furtherance element is not met because the murder was "only an afterthought and wholly unnecessary." However, there is evidence Croke resisted after being pulled out of the shower. Although Croke complied and relinquished the drugs, there is evidence he again resisted his attackers after they secured the drugs, but was overpowered and ultimately stabbed. After having been stabbed and attempting to crawl across the floor, he was stabbed once again before his attackers fled the scene. As such, it was reasonable for the jury to conclude the stabbing and ultimate killing of Croke was committed in furtherance of the felony. *See Nava v. State*, 379 S.W.3d 396, 405-06 (Tex.App.—Houston [14th Dist.] 2012), *aff'd*, 415 S.W.3d 289 (Tex.Crim.App. 2013)(Appellant argued evidence was insufficient that killing was committed in furtherance of the theft because the theft was complete at the time of the shooting, and court held, "[a]lthough the theft was legally complete, we conclude the jury also could have reasonably found that the shooting occurred during the commission and in furtherance of the theft as contemplated in the felony-murder statute.").

Furthermore, the Texas Court of Criminal Appeals has held the term "in the course of committing," as used in the capital murder statute, has the same meaning as the term used and defined in the robbery statute. *See Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Crim.App. 1986)

15

(*citing* TEX.PENAL CODE ANN. § 29.01(1)). Section 20.01(1) defines the term "in the course of committing" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission" of the offense. *Id*. [Internal quotation marks omitted]. The State was required to prove, beyond a reasonable doubt, that while attempting to commit, committing, or fleeing from the commission, the killing was done intentionally to commit the crime of robbery. *Id*. Such a showing was reasonable for the jury to conclude, beyond a reasonable doubt.

Issue Two is overruled.

In Issue Three, Appellant argues the evidence is insufficient to support Appellant should have known a murder would occur during the commission of the robbery—a required element for her conviction. Appellant basis this argument on her mistaken belief that the apartment was empty. Specifically, Appellant argues the only way the evidence could be sufficient on this issue is by finding she was aware Croke was present in the apartment. Appellant is mistaken.

Appellant, Olsen, Johnston, Acosta, and Chilton all agreed to commit burglary and/or robbery. Appellant drove to Las Cruces to attend a meeting with her coconspirators where they gathered masks, gloves, a shotgun and knives. In route from Las Cruces to the apartment, Appellant and her coconspirators discussed the roles each of them would play and Appellant provided her knowledge of the apartment layout. Appellant witnessed her coconspirators exit the vehicle with deadly weapons in hand. Appellant's contention that she thought the apartment was empty is without merit. *Ervin v. State*, 333 S.W.3d 187, 201 (Tex.App.—Houston [1st Dist.] 2010, pet. ref'd)(holding evidence sufficient to prove conspiracy to commit aggravated robbery in capital murder premised on coconspirator liability where defendant was aware of the plan to commit

16

robbery, watched his accomplices put on masks and hooded sweatshirts, knew they had guns, and returned to pick them up); *see also Love v. State*, 199 S.W.3d 447, 453 (Tex.App.—Houston [1st Dist.] 2006, pet. ref'd)("Evidence that a defendant knew his co-conspirators might use guns in the course of the robbery can be sufficient to demonstrate that the defendant should have anticipated the possibility of murder occurring during the course of the robbery."). The evidence establishes Appellant should have anticipated the possibility of a murder, especially knowing her co-conspirators possessed deadly weapons—Olsen and Johnston each carried a knife, Acosta carried a shotgun, and Chilton carried a BB gun that resembled a shotgun. *See Sholars v. State*, 312 S.W.3d 694, 703 (Tex.App.—Houston [1st Dist.] 2009, pet. ref'd)("[I]ntent to kill may be inferred from the use of a deadly weapon, unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon."). We find it clear Appellant should have anticipated a killing would occur, and as the ultimate fact finder, the jury was free to believe or disbelieve Appellant's contentions, and we conclude the jury's inference is supported by the evidence presented at trial. *See Hooper*, 214 S.W.3d at 13.

Issue Three is overruled.

## CONCLUSION

For these reasons, the judgement of the trial court is affirmed.


March 9, 2021

YVONNE T. RODRIGUEZ, Chief Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.

(Publish)